UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| KATEY S.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 4:20cv30 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Supplemental Security Income (SSI) as provided for in the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

2

1. The claimant has not engaged in substantial gainful activity since August 12, 2016, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: affective disorders, anxiety disorders, seizure disorder, and disorders of the spine (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that she can frequently balance, stoop, kneel, and crouch. She can occasionally climb ramps and stairs, and occasionally crawl. She can never climb ladders, ropes, or scaffolds; never work at unprotected heights; never work around dangerous machinery with moving mechanical parts; and never operate a motor vehicle as part of her work-related duties. She is limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas, and few changes in a routine work setting. She can never interact with the general public. She can work in proximity to other co-workers, but only with brief, incidental interaction with other co-workers and no tandem job tasks requiring cooperation with other co-workers to complete the task. In addition, she could work where supervisors occasionally interact with her throughout the workday.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on November 6, 1977 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 12, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18- 32).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on December 16, 2020. On February 26, 2021 the defendant filed a memorandum in support of the Commissioner's decision. Plaintiff has declined to file a reply. Upon full review of the record in this cause, this Court is of the view that the Commissioner's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff alleges disability beginning December 31, 2014, due to problems with bipolar disorder, posttraumatic stress disorder (PTSD), anxiety, borderline personality disorder, seizures, migraines, sciatica, obsessive compulsive disorder (OCD), depression, attention deficit hyperactivity disorder (ADHD), degenerative disc disease, and possible multiple personality disorder.

At the hearing, Plaintiff testified she does not drive, and either her husband drives her around or she takes the bus. (Tr. at 46). She volunteers with a church organization once a month and organizes clothing donations in her home. (Tr. at 47). She stated that she is unable to work due to her narcolepsy, seizures, sciatica, degenerative disc disease, and a lot of mental health issues. *Id*.

Plaintiff has pain in her lower lumbar that goes down the left side from her buttocks, to her thigh and down the back of her knee. (Tr. at 48). It occasionally radiates down the right leg. *Id*. The back and left leg pain occurs constantly on a daily basis. *Id.* She does have good and bad days with varying degrees of pain. *Id*. On a good day her pain is 4/10 in severity. *Id*. On a bad day her pain is 8/10. (Tr. at 49).

Plaintiff continues to struggle with migraines, with the severe ones occurring two to three times a week. *Id*. She just started taking a new preventative medication, and also has medicine to take at the onset of a migraine. *Id*. The onset medication, Relpax, takes twenty to thirty minutes to work. *Id*. For her milder migraines, she is able to function again after forty five minutes to an hour. (Tr. at 50). With the more severe migraines she is very light sensitive and has to sit with sunglasses on for at least an hour. *Id*.

Plaintiff takes seizure medication, but still has breakthrough episodes that can occur two or

5

three times a month, or may not occur at all for two or three months. (Tr. at 51). She has had four seizures in the past six months, which is pretty typical for her. *Id*. When a seizure occurs, she does not have much warning, just feels a little "weird" then blacks out completely. *Id*. She has been told that she flops like a fish, screams, and convulses. *Id.* When she wakes up she is extremely confused, emotional, and disoriented. *Id*. It can take five to six hours before she starts to feel functional again. *Id*.

Plaintiff struggles with sleepiness every day, and may sleep anywhere from ten minutes to two or three hours. (Tr. at 52). She never intends to fall asleep, and generally cannot be woken. *Id*. Despite being on a lot of medication to stay awake, she still falls asleep at least two times a day. *Id*.

On an average day, Plaintiff can sit for twenty to thirty minutes before she would start shifting. *Id*. Then her back and leg pain would be a problem. (Tr. at 53). She can stand for five to ten minutes before being in pain. *Id*. She can walk three blocks before she has to stop for two to three minutes before she can continue. *Id*.

Regarding her mental health impairments, Plaintiff rages uncontrollably two to three times a week where she screams, flips coffee tables, breaks things, and has to be physically subdued by her husband. (Tr. at 54). She has severe mood swings. (Tr. at 55). Her ability to focus and concentrate is not great. *Id*. During a half hour television program she cannot stay seated and pay attention, she will usually get up and do other things. (Tr. at 57). She often jumps from task to task. *Id*. She typically does not finish a chore after starting one. *Id*. She is unable to do laundry, dusting, or window cleaning. (Tr. at 59). On a bad day she is typically sitting in a bungee chair or lying on the couch asleep or wearing sunglasses due to a headache. *Id*.

6

The ALJ asked the vocational expert (VE) to consider an individual of Plaintiff's age, education, and work experience. (Tr. at 61). In his first hypothetical, the ALJ asked the VE to assume this individual is capable of medium work except they can frequently balance, stoop, kneel, and crouch; occasionally climb ramps and stairs and occasionally crawl; never climb ladders, ropes, or scaffolds; never work at unprotected heights or around dangerous machinery with moving mechanical parts; never operate a motor vehicle as part of the work-related duties; limited to simple, work-related decisions and simple, routine tasks with no assembly line work or strictly-enforced daily production quotas; few changes in a routine work setting; they could never interact with the general public; they can work in proximity to other coworkers, but only with brief incidental interaction with other coworkers; no tandem job tasks requiring cooperation with other coworkers to complete the task; and they could work with supervisors that occasionally interact with her throughout the workday. (Tr. at 61-62). The VE testified that this individual could perform work as a hand packager, laundry worker, or bus cleaner. (Tr. at 62).

The ALJ then asked the VE to assume the same characteristics as the first hypothetical, but added that the individual could never work in bright sunshine or bright flickering lights such as those experienced in welding or cutting metals, and they cannot work in settings that have more than a moderate noise level. (Tr. at 62-63). The VE testified that this individual could do work as a laundry worker, bus cleaner, or general helper. (Tr. at 63).

The ALJ's third hypothetical assumed the same characteristics as the second, but the individual is limited to light work. *Id*. The VE testified that this individual could perform work as an electronics worker, mail clerk, or plastic hospital products assembler. *Id*. The ALJ's fourth hypothetical assumed the same characteristics as the previous hypotheticals but adds that every

7

sixty minutes they must be allowed to shift positions or alternate between sitting and standing for one or two minutes a time while remaining on task and at the light level. (Tr. at 64). The VE testified that this individual could perform work as a plastics hospital products assembler and electronics worker, but at numbers reduced by 75% from the previous hypothetical, and as a cleaner and polisher also at reduced numbers. *Id*. Employers tolerate absence one day per month and off task behavior up to ten percent each day. *Id*. Plaintiff's attorney asked the VE to assume an individual who has episodes of negative behaviors in which she yells, and occasionally gets physical toward coworkers or a supervisor, on an ongoing basis once a month. (Tr. at 65). The VE testified that this individual would be terminated and this would preclude all work. *Id*.

In support of remand, Plaintiff first argues that the ALJ did not properly evaluate her migraine headaches and hyper-somnolence. In the Decision, the ALJ concluded that Plaintiff has severe impairments including affective disorders, anxiety disorders, seizure disorder, and disorders of the spine. (Tr. at 18). The ALJ further concluded that Plaintiff has migraines and asthma that are deemed to be nonsevere. *Id*. He made no determination as to whether Plaintiff's narcolepsy is a medically determinable impairment, or if it is severe or nonsevere. The ALJ provided a brief summary of some of the treatment records that referred to Plaintiff's migraines, yet ultimately concluded that "[g]iven the normal imaging of the brain, the reported improvement when compliant with medications, and the inconsistencies between the reported severity and frequency with the medical evidence, the undersigned finds that this condition is nonsevere." *Id*.

An impairment is non-severe only when the impairment is so slight that it has no more than a de minimis effect on the ability to perform basic work activities. "An impairment is not severe if it does not significantly limit your physical or mental abilities to do basic work activities." 20

C.F.R. 404.1521(a) and 416.921(a).

Plaintiff argues that she has consistently reported difficulty with and sought treatment for frequent severe headaches and migraines. (Tr. at 479, 486, 489, 504, 509, 513, 525, 682, 693, 705, 742, 745, 840, 848, 852, 1041, 1046). They are mainly to the bilateral temporal lobes, with pressure to both eyes. (Tr. at 682, 742, 840, 848, 852). Her headaches occur constantly on a daily basis, but she also experiences more severe migraines at least once every two weeks that are debilitating. (Tr. at 479, 486, 489, 693, 745, 840, 848). She told the consultative examiner she has migraines twice a week lasting from two to eight hours, but they can occasionally last up to two days. (Tr. at 762). Later she noted having more than fifteen migraine days a month. (Tr. at 525). Dr. Hammoud noted that the migraines are uncontrolled on a low dose of Topiramate, and they are still occurring about three times per week. (Tr. at 1061). Later Plaintiff continued to have frequent headaches that can be migraines twice a week. (Tr. at 1046). They are triggered by excessive stress, emotional upset, or fatigue. (Tr. at 763, 848). They are associated with difficulty in coordination, fatigue, nausea, sensitivity to light, sensitivity to sound, stiff neck, unsteadiness, vomiting, tunnel vision, blurred vision, insomnia, and loss of appetite. (Tr. at 486, 525, 763, 840). Plaintiff has spots in her field of vision as well as dizziness due to migraines. (Tr. at 745). Relieving factors include medication (Excedrin), application of cold, dim and quiet environment, lying flat, rest, and sleep. (Tr. at 840). The headaches interfere with most activities of daily living and she has already failed multiple drugs including beta blockers, tryptans, Topamax, NSAIDs, and TCAs. (Tr. at 525).

In reviewing the medical evidence of record, however, the ALJ correctly noted that Plaintiff's headaches improved when she took medications and worsened when she did not. For

instance, the ALJ noted that Plaintiff reported headaches in August 2016 after she stopped taking her headache medication (Excedrin for Migraines) (Tr. 18, 682). The ALJ further considered that Plaintiff reported ongoing headaches and that in October 2017 Plaintiff's doctor agreed to Plaintiff's request that he prescribe Relpax, an abortive migraine medication that Plaintiff's friend had recommended (Tr. 18, 517). Notably, a progress note from January 2018 stated that, although Plaintiff complained of daily headaches and had experienced one that morning with vomiting and photophobia, Plaintiff told her doctor that she was taking Relpax as needed, and that it worked well (Tr. 18, 486). Similarly, the following month's progress note documented Plaintiff's statements that her medication was working well and her migraines were much better with fewer and less intense headaches (Tr. 18, 513). The ALJ considered that another doctor had at one point described Plaintiff's migraines as uncontrolled, but that Plaintiff was not taking Topiramate as prescribed then, and that at a May 2018 doctor visit, Plaintiff reported that Relpax was effective as an abortive treatment for her migraines (Tr. 18, 1057). The ALJ considered Plaintiff's complaint to her doctor that she had nausea with headaches—and that at a follow up visit (in September 2018), Plaintiff reported that medication helped the nausea (Tr. 18, 504).

    The ALJ also considered laboratory diagnostic tests and neurological examination as evidence relevant to Plaintiff's complaint of migraines: a 2017 MRA (Magnetic Resonance Angiography) of the brain was normal, as was a May 2018 neurological examination (Tr. 18, 499, 512).

    Accordingly, this Court finds that the ALJ reasonably concluded that Plaintiff had not demonstrated that her migraines were a severe impairment, as the record did not demonstrate that they significantly limited Plaintiff's ability to perform basic physical work activities such as

walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, and speaking. 20 C.F.R. § 416.921.

Plaintiff alleges that the ALJ "played doctor" in finding her migraines non-severe—but in doing so, she offers primarily her own subjective complaints to support her allegation. Subjective complaints alone, of course, cannot establish disability. 20 C.F.R. § 416.929. Plaintiff has not pointed to any instance in which the ALJ actually substituted his judgment about the impact of her migraines on the ability to perform work-related activities for that of a medical expert.

Regarding Plaintiff's narcolepsy or hypersomnolence, the ALJ acknowledged Plaintiff's testimony that she is unable to work in part due to narcolepsy; she falls asleep during daytime hours two to three times a day for ten minutes to two or three hours; a neurology visit for episodes of appearing to be asleep from 20-120 minutes and daytime drowsiness; a diagnosis of narcolepsy; and a sleep study showing evidence of idiopathic hypersomnia. (Tr. at 23, 25, 26). The ALJ found that "considering the totality of the evidence including the inconsistent reports as to the frequency and severity of both the sleep issues and seizures, the generally normal neurological examination findings, the negative EEG, the documented improvement in the symptoms with medication, and the reported activities including exercising and travel, the undersigned finds that the seizure disorder and sleep issues are well considered in the residual functional capacity assessed herein." (Tr. at 26).

Again, the record shows that the ALJ amply considered Plaintiff's subjective complaints of hyper-somnolence related to seizures (Tr. 23). The ALJ noted that the evidence showed Plaintiff sought treatment for seizures in August and September of 2016 (Tr. 24). However, the ALJ also explained that Plaintiff's doctors did not perform neurological evaluations at those visits, and

11

Plaintiff was treated with medication (Tr. 24, 720-60). The ALJ cited to EEG results showing no abnormal findings and no electrophysiological correlates with Plaintiff's reported symptoms (Tr. 24, 755). In September 2016, Plaintiff's doctor found her seizure disorder to be controlled (Tr. 24, 829). The ALJ considered the report of consultative examiner Dr. Koerber, who found no neurological deficits on examination (Tr. 25, 765).

The ALJ considered reports of seizures in March (after running into a wall head on), April, and August, 2017 (Tr. 25, 490, 836, 900). Neurological examinations were normal, and Plaintiff reported that medications were helping with seizures (Tr. 25, 491, 523). The ALJ observed that August 2017 findings that Plaintiff was alert, oriented, and cognitively intact were inconsistent with her complaints of sleep problems (Tr. 25, 491). The ALJ considered evidence of multiple examinations during the remainder of 2017, showing Plaintiff to be alert and oriented, cognitively intact, and with no focal neurological deficits (Tr. 25, 489-95, 900).

The ALJ considered that Dr. French diagnosed narcolepsy in February 2018 (Tr. 25, 513). He also noted that Plaintiff's claim in May 2018, when she reported a seizure and said it was the first one she had experienced in two years, was inconsistent with her allegations of frequent seizures (Tr. 26, 1054). The ALJ continued to consider evidence throughout 2018, including a seizure caused by amphetamine use, and noted that Plaintiff's daytime sleepiness was deemed controlled with medications (Tr. 26, 1039).

The ALJ also considered that Plaintiff's numerous activities, including the fact that she helps run a non-profit organization (Tr. 20). Plaintiff also takes public transportation and shops in stores on a regular basis (interacting in a public environment), has lunch with a friend every Sunday, travels, exercises and walks her dogs daily, mows the lawn, rides a bicycle, and does

12

housekeeping (Tr. 20-21, 24). The ALJ also found that Plaintiff's plans to travel to California for a month were inconsistent with her claims of disabling sleepiness (Tr. 25, 598).

Clearly, the ALJ relied on substantial evidence that demonstrated that Plaintiff did not need any restrictions other than those contained in the RFC, and thus remand is not warranted.

Next, Plaintiff argues that the ALJ did not properly weigh the opinion of her treating physician, Dr. Gregory French, M.D. Dr. French completed a RFC assessment regarding his treatment of Plaintiff for her low back pain. (Tr. at 1063). He noted that she has low back pain with associated left leg pain and discomfort. *Id*. She takes medication including muscle relaxers, oral steroids, NSAIDs, and anticonvulsants. *Id*. Dr. French circled both twenty minutes and two hours regarding how long Plaintiff can sit and stand at one time each. *Id*. She can sit less than two hours total in an eight hour workday, and can stand/walk less than two hours total in an eight hour workday. (Tr. at 1065). She would require the ability to walk around for ten minutes every hour during an eight hour workday. *Id*. She can frequently lift and carry up to ten pounds and occasionally up to twenty pounds. *Id*. She can frequently look down, turn head left or right, look up, and hold her head in a static position. *Id*. Plaintiff can rarely twist, stoop, crouch/squat, balance and climb stairs, and can never climb ladders. (Tr. at 1066). She experiences both good days and bad days, and is likely to be absent from work about four days per month as a result of her impairments or treatment. *Id*. She cannot tolerate any concentrated exposure to temperature extremes, vibration, and humidity/wetness. (Tr. at 1067). She can tolerate less than moderate exposure to noise, dust, hazards, and respiratory irritants such as fumes, odors, chemicals and gases. *Id*.

While the ALJ addressed Dr. French's assessment, he gave the opinion "very little weight"

as he found it to be inconsistent with Dr. French's own treatment notes and other physical examination findings in the medical record. (Tr. at 29).

An ALJ must give controlling weight to the medical opinion of a treating source if the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give such an opinion controlling weight, then he must provide "good reasons" for discounting such opinions. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Regulations direct that Social Security will generally "give more weight to opinions from your treating sources." When determining the weight to be accorded a medical opinion, factors are listed that must be considered. These are the nature of the treating relationship, length of the treating relationship, supportability, consistency, and specialization of the source. 20 CFR § 404.1527(c); § 416.927(c).

Social Security Ruling 96-2p (which has been rescinded, but was still in effect for all cases filed before March 27, 2017, including this one) states that a treating source's opinion is always entitled "deference" and may be entitled to "the greatest weight" when it is not given controlling weight. It is agency policy that treating source opinions are entitled to deference because these opinions are most likely to be "able to provide a detailed longitudinal picture" of a claimant's medical history, and "usually have the most knowledge about their patient's conditions. 20 CFR § 404.1527(c)(2); § 416.927(1)(2); 56 FR 36932-01, 36936 (1991). All things being equal, when a treating source has seen a claimant for long enough to develop a longitudinal perspective, social

14

security "will always give greater weight to the treating source's opinions than to the opinions of a non-treating source. That is done even when the other opinions are also reasonable or even if the treating source's opinion is inconsistent with other substantial evidence of record. *Id*.

The ALJ discussed the progress notes of Dr. French throughout his Decision (Tr. 25, 26, 27, 28, 29).The ALJ explained that Dr. French's opinion was neither consistent with his own progress notes, nor with other evidence of record. In so doing, the ALJ noted that when Plaintiff returned for treatment after a sprain, Plaintiff had only mild pain in the neck and lumbar spine, with normal gait, strength, sensation and no pain behaviors (Tr. 29, 504-508). Plaintiff had tenderness on examination with Dr. French in October 2018, but she told him that the pain was relieved with medication and physical therapy (Tr. 29, 543). At a neurology examination in December 2018, Plaintiff had a normal gait and normal muscle strength in all extremities (Tr. 29, 1039).

Plaintiff's argument that the ALJ did not discuss the weight he gave to Dr. French's opinion is unsupported. Plaintiff acknowledges that Dr. French gave inconsistent responses by circling both twenty minutes and two hours regarding how long Plaintiff can sit and stand. That point supports the ALJ's decision to give very little weight to the opinion and undermines Plaintiff's assertion that the ALJ erred.

Plaintiff further contends that the ALJ did not explicitly address the regulatory factors for determining what weight to give the opinion. Those factors include: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; and whether the source is a specialist. 20 C.F.R. § 416.927 (c)(2). However, as noted above, the ALJ did discuss the consistency of the opinion with both Dr. French's own notes and with other

15

evidence of record. In addition, the ALJ correctly identified Dr. French as Plaintiff's primary care physician—and thus, not a specialist.

Plaintiff does not identify which of the regulatory factors would cause a different result even if the ALJ had more specifically discussed them. The length of the treatment relationship was very short: about 3-4 months, and Dr. French did not specify the frequency of contact or the nature or extent of the treatment relationship (Tr. 1063). The supportability of Dr. French's form opinion was very limited (Tr. 1063-67). Dr. French cited minimal findings in support of his opinions, such as citing only "complicated by seizures" when opining that Plaintiff could not tolerate even a low stress job (Tr. 1064). Dr. French did not cite the frequency, nature, or severity of the seizures; nor did he explain why he thought they would preclude even low stress work (Tr. 1064). In some instances, he did not explain those findings at all, such as when asked whether the impairments were reasonably consistent with the symptoms (Tr. 1064). The remaining items on the form Dr. French filled out did not explain his opinions (Tr. 1064-67).

Thus, because Dr. French's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was inconsistent with other substantial evidence in the case record, this Court finds that the ALJ's weighing of the opinion was consistent with the Commissioner's regulations. 20 C.F.R. § 416.927(c)(2). Accordingly, the Decision will be affirmed.

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby AFFIRMED.

Entered: March 17, 2021.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court